IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JOHN F. SULLIVAN, WILLIAM E. PHILLIPS,
KAREN N. WITHEE, PAUL J. SPECHT and
THOMAS O. OLSON, on behalf of themselves
and all others similarly situated,

                    Plaintiffs,

      v.

CUNA MUTUAL INSURANCE SOCIETY and
CUNA MUTUAL GROUP MEDICAL CARE
PLAN FOR RETIREES,

                    Defendants.

OPINION AND ORDER

09-cv-455-vis[1]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      This is a civil action in which plaintiffs John F. Sullivan, William E. Phillips, Karen

N. Withee, Paul J. Specht and Thomas O. Olson contend that defendants Cuna Mutual

Insurance Society and Cuna Mutual Group Medical Care Plan for Retirees have violated the

provisions of the Employee Retirement Income Security Act of 1974 and Wisconsin

common law by eliminating the payment of a percentage of retirees' health premiums

---

      [1] The parties have declined the jurisdiction of the magistrate judge in this case and
it has been set for assignment to a visiting judge.  Because no Article III judge has been
assigned as of yet, I am assuming jurisdiction over this case for the purpose of this order.

through employer contributions and sick leave accounts.  Defendants filed a motion to dismiss plaintiffs' claims under Fed. R. Civ. P. 12(b)(6).  Dkt. #14.

Plaintiffs believe that they were guaranteed a lifetime benefit by defendant CUNA Mutual Insurance Society, but the facts of the case and the applicable law do not support their belief.  Their rights never vested and defendant never made an irrevocable promise to them that it would maintain the healthcare benefits at their initial level.  Instead, it always reserved its right to make changes in the benefits.  Nothing in ERISA or state law makes that reservation of rights improper or invalid.

It is clear that the allegations in plaintiffs' complaint and in the documents attached to the complaint do not state a claim for relief under ERISA, no matter how favorably to plaintiffs they are construed, and that the state law claims are preempted by ERISA. Therefore, defendants' motion to dismiss will be granted.

Before discussing the pertinent facts, a word about the source of those facts is in order.  Generally, in deciding a motion to dismiss, a court should consider only the allegations in the complaint.  Centers v. Centennial Mortgage, Inc., 398 F.3d 930, 933 (7th Cir. 2005).  However, a court may also consider written instruments attached to the complaint.  Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes."); Tierney v. Vahle, 304 F.3d 734, 738 (7th Cir. 2002) (court may consider attachments to complaint without converting motion to

2

dismiss into motion for summary judgment).

Although the court accepts as true well-pleaded, that is, non-conclusory, allegations, Riley v. Vilsack, ___ F. Supp 2d ___, 2009 WL 3416255, at *7 (W.D. Wis. Oct. 21, 2009), "[w]here an exhibit and the complaint conflict, the exhibit typically controls." Forrest v. Universal Savings Bank, F.A., 507 F.3d 540, 542 (7th Cir. 2007). In other words, "[a] court is not bound by the party's characterization of an exhibit and may independently examine and form its own opinions about the document." Forrest, 507 F.3d at 542 (citing McCready v. eBay, Inc., 453 F.3d 882, 891 (7th Cir. 2006) (citation omitted)). "Thus, a plaintiff 'may plead himself out of court by attaching documents to the complaint that indicate that he or she is not entitled to judgment.'" Massey v. Merrill Lynch & Co., Inc., 464 F.3d 642, 645 (7th Cir. 2006) (quoting Centers, 398 F.3d at 933).

Plaintiffs attached 62 pages of exhibits to their complaint. Those exhibits include succeeding versions of defendants' postretirement health benefit plan, amendments to the plan, plan election forms, company memorandums and portions of defendants' consolidated financial statements. All those attached exhibits will be considered in deciding defendants' motion, along with a page of defendants' financial statement, which they attached to their motion. Dkt. #16, exh. 2. Wright v. Associated Insurance Companies Inc., 29 F.3d 1244, 1248 (7th Cir. 1994) ("documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim");

see also 188 LLC v. Trinity Industries, Inc., 300 F.3d 730, 735 (7th Cir. 2002) (quoting

Wright).

I find that the following facts are fairly alleged in the complaint and attached exhibits.

ALLEGATIONS OF FACT

A.  Parties

Defendant CUNA Mutual Insurance Society is a mutual insurance company that was

organized and existed under the laws of Wisconsin until 2007 when it reorganized under the

laws of Iowa.  Defendant CUNA Mutual is the employer and plan sponsor of defendant

CUNA Mutual Group Medical Care Plan for Retirees, which is an employee welfare benefit

plan under section 3(1) of ERISA, 29 U.S.C. § 1002(1).  (All further references to CUNA

Mutual will be to the insurance society, as employer and plan sponsor.)  Plaintiffs John F.

Sullivan, William E. Phillips, Paul J. Specht and Thomas O. Olson are retired employees of

defendant CUNA Mutual who elected to participate in the CUNA Plan upon retirement and

were not subject to any collective bargaining agreement.  Sullivan retired in 1996, Phillips

in 1993, Specht in 2008 and Olson in 2001.  Plaintiff Karen N. Withee is a retired

employee of defendant CUNA Mutual who chose to participate in the CUNA Plan and, as

a union member, was subject to a collective bargaining agreement.

4

### B.  The CUNA Plan and 1982 Memorandums

In 1976, defendant CUNA Mutual issued a written instrument to evidence its employee welfare benefit plan.  A portion of the plan states that

> 12.  The Employer may amend, modify, suspend, withdraw or terminate the Plan at any time, including any Exhibit A, and, by agreement with the insurer or insurers involved, any Policy.

Exh. to Cpt., dkt. #2, at PL-COMP 000002.

Beginning in 1982, CUNA Mutual created personal sick leave accounts for management employees.  On July 9, 1982, it issued a memorandum to management employees, explaining

> Your CUNA Mutual Insurance Group employer has modified its Policy on premium contributions for a Qualified Management Retiree's coverage under the group contract providing insurance for the CUNA Mutual Group Health Plan.  This Memorandum is to inform you about the new Policy on premium contributions. . . .
>
> This Policy applies only to Qualified Management Retirees who retire on or after January 1, 1982 and while this Policy continues in effect.
>
> . . . .
>
> While this Policy continues in effect, a CUNA Mutual Insurance Group former employer will make the following contribution toward payment of the premium for coverage of Qualified Management Retiree under the Group Health Contract:
>
> > first, payment of the percentage of the premium shown for the Qualified Management Retiree's status in the table under (2) above, except the percentage shall be 60% if the Qualified Management

> Retiree is eligible under (1) above; and
>
> second, payment of the balance of the premium to the extent of any then available sick leave credit as determined by multiplying the Qualified Management Retiree's earned and unused sick leave hours at retirement by 70% of the [retiree's] hourly salary rate just prior to retirement and thereafter reducing the resulting dollar credit by each amount the former employer pays under this sick leave credit.

Id., dkt. #2, at PL-COMP 000052.  Creating the sick leave accounts was a successful policy. By the time of retirement, many employees had obtained sick leave credit levels that could pay in excess of $100,000 toward premium payments, which would have been enough to pay the full amount of anticipated expenses for retiree health benefits for a retiree and his or her beneficiaries.

In 1983, union employees were given two options with respect to their sick leave accounts.  Upon retirement, they could either (1) convert their accumulated, unused sick days into a non-cash account that would be used to pay the premiums on their insurance provided for under the retirement health benefits plan or (2) take a cash payout.  Non-union employees did not have the second option.  To keep track of an employee's accumulated, unused sick days, CUNA Mutual maintained ledger entries.  The non-cash accounts could be used only to pay annual health insurance premiums for retirees participating in the CUNA Plan.

6

## C.  Plan Election Forms

Retiring CUNA Mutual employees were provided a group health election form allowing them to choose whether to participate in defendant CUNA Mutual's group health coverage, known as the CUNA Plan.  The election forms provided the percentage of the monthly premiums for which CUNA Mutual was responsible and the percentage for which the retired employee was responsible.  For example, the form signed by plaintiff Sullivan stated in relevant part:

> I elect to continue the CUNA Mutual Group Health coverage family (employee & spouse) plan by paying 60% of the monthly premium.  (CUNA Mutual pays 40%.)

Id., dkt. #2, at PL-COMP 000055.  The form signed by plaintiff Specht stated in relevant part:

> I elect the CUNA Mutual Group Health coverage by paying 44% of the monthly premium.  (CUNA Mutual pays 56%).

Id., dkt. #2, at PL-COMP 000057.

The forms also gave enrollees information about their non-cash sick leave accounts. For example, Sullivan's form stated:

> Effective July 1, 1996, the premium will be paid from the sick-leave dollar value calculated at retirement in accordance with the administrative ruling dated July 9, 1982.

Id., dkt. #2, at PL-COMP 000055; Olson's stated:

7

> My 60% monthly contribution will be deducted from my estimated sick leave dollar balance, $145,443.08 until it is exhausted.  After that time, my premiums will be deducted from my monthly Pension check if I wish to continue coverage.

Id., dkt. #2, at PL-COMP 000056; and Specht's stated:

> My premium will be deducted from my sick leave dollar balance, $71,838.29, until it is exhausted.  After that time, I will be notified how to pay for premium if I wish to continue coverage.

Id., dkt. #2, at PL-COMP 000057.  Election forms stated that "I understand the premium is subject to change," or "I understand the premiums and/or benefits are subject to change."

Id., dkt. #2, at PL-COMP 000055-000058.

### D.  The 1995 Modification of the CUNA Plan

In 1995 defendant CUNA Mutual modified the CUNA Plan.  The purpose of the CUNA Plan was "to provide group health care coverage to Retirees and Dependents."  Id., dkt. #2, at PL-COMP 000010.  The "established and executed" portion of the CUNA Plan set out the "terms and conditions pursuant to which the Plan shall be maintained[.]" Id., dkt. #2, at PL-COMP 000007.  The "terms and conditions" of the CUNA Plan included the following two paragraphs:

> 7.  Benefits to be provided under the Plan shall be exclusively those provided under the policies in accordance with their terms, conditions and provisions, and this exclusive manner of providing benefits shall be the funding policy and method of the Plan.

8

. . . .

> 10.   The Employer expects the Plan to be permanent, but since future conditions affecting the employer cannot be anticipated or foreseen, the Employer must necessarily and does hereby reserve the rights to amend, modify or terminate the Plan including all or any part of Exhibit A at any time by action of its Board.  The Employer may also make any modification or amendments to the Plan retroactively, if necessary or appropriate, to qualify or maintain the Plan as a plan meeting the requirements of the Internal Revenue Code of 1954 or the Act as now in effect or hereafter amended or the regulations issued thereunder.  No amendment of the Plan shall cause any part of the Plan to be used for, or diverted to purposes other than for the exclusive benefit of the Participants or their dependents covered by the Plan.

Id.

Article V of the CUNA Plan provided information on the funding of the plan.

Specifically, subsection 5.1, entitled "Premium," stated:

> For Participants, the Employer shall contribute toward the cost of group medical care coverage elected under this Plan according to the Enrollment Form.

Id., dkt. #2, at PL-COMP 000017.  Article VII of the CUNA Plan provided miscellaneous

information, including the following regarding termination and changes to the plan:

> The Plan may at any time be amended or terminated by a written instrument signed by the President of the Employer and approved by the Board of Directors.  From time to time, the Plan Administrator shall update the Enrollment Form to show the maximum amount of contributions.

Id., dkt. #2, at PL-COMP 000020.  The CUNA Plan stated that "[t]his Plan shall not be

deemed to constitute a contract between the Employer and any Participant or to be a

9

consideration or an inducement for the employment or participation in the Plan of any Participant." Id.

### E. Amendments to the CUNA Plan

In 2000, the 1995 version of the CUNA Plan was amended in several respects, one of which was to provide benefits under the plan on a self-funded basis. In 2002, the 1995 version of the CUNA Plan was amended again in several respects not relevant to this case.

On August 1, 2007, the CUNA Plan was amended and restated. The amended and restated version did not include a "established and executed" portion or the "terms and conditions" under that portion in the 1995 version of the plan. The funding for the CUNA Plan did not change: "the Employer shall contribute toward the cost of the coverage elected under this Plan according to the Enrollment Form." Id., dkt. #2, at PL-COMP 000035. The 2007 amended and restated plan stated that "[t]he Employer may amend or terminate the Plan at any time." Id., dkt. #2, at PL-COMP 000043.

On December 31, 2008, the CUNA Plan was amended again. This amendment eliminated any further contributions or subsidies by defendant CUNA Mutual. Specifically, the amendment stated:

> Effective as of the end of business on December 31, 2008, the Employer shall not make any further contributions and eliminate any other subsidies under the Plan for any Participant, except:

10

. . . .

(c) Represented employees who retired after April 1, 1983, with respect to sick leave that was converted to a non-cash account. Such non-cash accounts shall continue to be available to those employees.

[E]ffective as of the end of business on December 31, 2008, the Employer shall eliminate all contributions and subsidies, including sick leave converted into non-cash accounts . . . . Participants shall be responsible for the entire cost of premiums.

Id., dkt. #2, at PL-COMP 000049. (The elimination of contributions and subsidies includes additional exemptions not relevant to this case.)

F. Accounting for Retiree Benefits

The effect of eliminating the contributions and subsidies for retirement health benefits resulted in a $121,823,000 pre-tax increase in defendant CUNA Mutual's 2008 income. Although retirement health benefits were funded on a pay-as-you-go basis, CUNA Mutual was required to recognize the cost of those benefits as a liability on an accrual basis as employees performed services that could entitle them to the benefits. CUNA Mutual did not maintain a segregated trust or "res" to fund retiree health benefits, but paid the costs out of its general assets.

11

OPINION

A.  Rule 12(b)(6) Standard

Under Fed. R. Civ. P. 12(b)(6), a claim or entire complaint may be dismissed for a "failure to state a claim upon which relief can be granted."  Although a plaintiff does not have to include detailed factual allegations, it must allege enough facts to raise its right to relief above the speculative level.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007); see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").  Dismissal under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," id. at 558, including instances in which the plaintiff pleads himself out of court by pleading facts precluding recovery.  Hefferman v. Bass, 467 F.3d 596, 600 (7th Cir. 2006) (citing McCready, 453 F.3d at 888 ("if a plaintiff pleads facts which show he has no claim, then he has pled himself out of court").

B.  The ERISA Claims

In their complaint, plaintiffs assert three claims against defendants under ERISA: (1) breach of fiduciary duty under § 404(a)(1), 29 U.S.C. § 1104(a); (2) involvement in a prohibited transaction under § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D); and (3) violation

12

of the plan document.  Before addressing whether plaintiffs' allegations and the attached exhibits support these claims, I must resolve some foundational issues about the CUNA Plan and its terms.  The  parties' disputes stem from differing interpretations of the CUNA Plan and the application of the law to the plan.  In particular, the parties dispute whether the plan provides vested benefits and they disagree about the scope of the exclusive benefits clause and the nature of the non-cash sick leave accounts.  Resolution of these disputes will resolve plaintiffs' claims.  (I note that although plaintiffs do not discuss the issue, all plaintiffs cannot pursue the same arguments in support of the claims raised in the complaint.  Because plaintiff Withee was a union employee subject to a collective bargaining agreement, her claims against defendants depend only on the termination of their contribution to her health insurance premiums.  The other arguments raised by plaintiffs regarding termination of sick leave accounts do not apply to Withee because her non-cash sick leave account was not terminated by the 2008 Amendment.)

1.  Interpreting the CUNA Plan

a.  Vested or unvested benefits

"ERISA is a comprehensive statute designed to protect the interests of employees and their beneficiaries in pension and welfare benefit plans."  Anweiler v. American Electric Power Service Corp., 3 F.3d 986, 989-90 (7th Cir. 1993).  An employee benefit plan can be

13

classified as a pension benefit plan under § 3(2) or a welfare benefit plan under § 3(1).  29 U.S.C. §§ 1002(1) & (2).  A pension benefit plan provides retirement income to employees or allows employees to defer the receipt of income until or beyond the termination of the covered employment.  29 U.S.C. § 1002(2)(A).  A welfare benefit plan provides medical benefits or benefits in the event of some other occurrence, such as death or unemployment.  29 U.S.C. § 1002(1).  The difference in classification is crucial.  Pension benefits are subject to strict vesting and funding requirements but welfare benefits, such as health and life insurance, are not.  Bland v. Fiatallis North America, Inc., 401 F.3d 779, 783 (7th Cir. 2005) (citing 29 U.S.C. § 1051(1)).  For example, welfare benefits "vest[ ] only if the plan contract so provides."  Id.

Plaintiffs allege in their complaint that the CUNA Plan "is an employee benefit plan as defined in 29 U.S.C. § 1002(3)."  Cpt., dkt. #1, at 3 ¶8.  Section 3(3) states that "'employee benefit plan'" . . . means [1] an employee welfare benefit plan or [2] an employee pension benefit plan or [3] a plan which is both an employee welfare benefit plan and an employee pension benefit plan."  29 U.S.C. § 1002(3).  Plaintiffs do not say which of the three categories listed under § 3(3) describes the CUNA Plan.  Nonetheless, the other allegations in the complaint and the attached plan documents make it clear that the CUNA Plan's purpose and function was to provide medical benefits in the form of health insurance.  Thus, the CUNA Plan is an employee *welfare* benefit plan.  29 U.S.C. § 1002(1).

14

Because the CUNA Plan is a welfare benefit plan, the employer and plan sponsor, CUNA Mutual, is "generally free under ERISA, for any reason at any time, to adopt, modify, or terminate" the plan. <u>Curtiss-Wright Corp. v. Schoonejongen</u>, 514 U.S. 73, 78 (1995). Limitations on alterations to welfare benefit plans must come from the terms of a particular contract. <u>Bland</u>, 401 F.3d at 783. For example, welfare benefits may vest if the employer elects "to enter into a private contract with employees as set forth in benefit plan documents." <u>Id.</u>

Determining whether the CUNA Plan provided plaintiffs with vested benefits is a matter of contract interpretation. <u>Id.</u> Under applicable federal principles of contract construction, "a document should be read as a whole with all its parts given effect, and related documents must be read together." <u>Id.</u> Because "[u]pon vesting, benefits become forever unalterable, and because employers are not legally required to vest benefits, the intention to vest must be found in 'clear and express language' in plan document." <u>Id.</u> at 784 (citation omitted). However, the plan documents need not "use the word 'vest' or some variant of it" to create rights that do not expire. <u>Id.</u>

Initially, it is necessary to determine which documents are plan documents. Defendants contend in their reply brief that the court should look only to the 2007 amendment and restatement of the CUNA Plan, not the 1995 version, in addressing plaintiffs' claims. Defs.' Reply Br., dkt. #28, at 4. However, defendants have waived this

15

argument by raising it for the first time in their reply brief.  Nelson v. La Crosse County District Attorney, 301 F.3d 820, 836 (7th Cir. 2002).  At any rate, because the 2007 version of the CUNA Plan was an amendment and did not contain an "established and executed" portion to replace the portion set out in the 1995 and 1976 versions, it is reasonable to infer that the 2007 plan did not completely replace the 1995 version but merely amended it.  Thus, I will consider both the 1995 and 2007 versions of the CUNA Plan.

When deciding what other documents are plan documents, the court one must keep in mind that an ERISA plan is more than a piece of paper; it is "a more inchoate group of rights, benefits and procedures (literally, a 'plan') set up by an employer to create pension or welfare benefits."  Orth v. Wisconsin State Employees Union Council 24, 500 F. Supp 2d 1130, 1140 (E.D. Wis. 2007) aff'd, 546 F.3d 868 (7th Cir. 2008).  Although many different documents may evidence a plan, it is the information the documents provide that matters.  E.g., id. (plan may be evidenced by any documents "that describe the rights of beneficiaries or such things as how the plan is administered, how premiums are collected, etc.").  Here, in addition to the different versions of and amendments to the CUNA Plan, it is proper to consider the 1982 Memorandum and the retirees' enrollment forms.  Both the memorandum and enrollment forms gave retirees information on how health insurance premiums would be paid.  Further, the memorandum says specifically that it is modifying the premium payment policy on retirees' health coverage.

16

In reviewing all the pertinent CUNA Plan documents, I can find no clear and express language providing for the vesting of retiree health care benefits.  None of the plan documents provide "life-time" language, such as "benefits will continue" or "shall remain" as long as the member is living or even that any benefit is provided "for life."  Plaintiffs fail to point to any language regarding duration in plan documents from which one could infer that the benefits are vested.

In addition to being silent on vesting, the plan documents contain clear and express reservation of rights clauses.  The Court of Appeals for the Seventh Circuit has found that even when a welfare plan provides benefits "for life," the words do not support a finding that benefits have vested when the plan includes a reservation of rights clause.  Vallone v. CNA Financial Corp., 375 F.3d 623, 633 (7th Cir. 2004).  In this instance, the "for life" language may be construed as "'good for life unless revoked or modified.'"  Id.  Put another way, "the 'lifetime' nature of a welfare benefit does not operate to vest that benefit if the employer reserved the right to amend or terminate the benefit . . . ."  Id. at 634.  Every version of the CUNA Plan contains a clause granting CUNA Mutual the right to "amend or terminate the Plan at any time."  Exh. to Cpt., dkt. #2, at PL-COMP 000043; see also id. at PL-COMP 000002, 000007 and 000020.

Plaintiffs contend that the election forms vested their benefits in their sick leave accounts because the forms said that the accounts would be used to pay premiums until the

accounts were "exhausted."  Id., dkt. #2, at PL-COMP 000056-57.  As with "for life" language, reconciling the CUNA Plan's reservation of rights clause with the "until exhausted" language requires construing the language as meaning "until exhausted unless the plan is revoked or modified."  This interpretation is further confirmed by examining the 1982 memorandum creating the sick leave account policy, which states that the sick leave account policy would last only while the overall policy on employer premium contributions continued to exist.  Id., dkt. #2, at PL-COMP 000051-52.

Plaintiffs deny that the CUNA Plan is silent on vesting, arguing that the reservation of rights clause is limited by the exclusive benefits clause found in the 1995 version of the plan, which states, "No amendment of the Plan shall cause any part of the Plan to be used for, or diverted to purposes other than for the exclusive benefit of the Participants[.]" Exh. to Cpt. ,dkt. #2, at PL-COMP 000007.  They are mistaken.  A plain reading of this language does not imply that plaintiffs have a vested right to retiree health care benefits.

The exclusive benefit clause does not say anything about the duration of benefits and it does not say that benefits cannot be terminated.  Nonetheless, plaintiffs read the clause as providing vested benefits.  They do this by interpreting the clause to prohibit CUNA Mutual from amending the CUNA Plan in any way that would reduce participants' benefits below the levels provided for under the 1995 version of the plan.  Under plaintiffs' interpretation, the plan's exclusive benefit clause would contradict its reservation of rights

18

clause, which reserves to CUNA Mutual the right to amend, modify or terminate the plan because "future conditions affecting the employer cannot be anticipated or foreseen[.]" Id., dkt. #2, at PL-COMP 000007.  If plaintiffs are correct, the reservation of rights clause would drop out of the picture and CUNA Mutual would be prohibited from modifying the CUNA Plan in any way that would reduce participant benefits, including terminating the plan.

In plaintiffs' view, the exclusive benefit clause merely modifies the reservation of rights by limiting the type of amendments allowed.  However, plaintiffs' reading of the clause does not merely modify the clause—it contradicts it.  The CUNA Plan states that future conditions could necessitate amending or even terminating the CUNA Plan; under plaintiffs' reading such conditions could never be considered if the result would be a decrease in benefits.  Simply put, the plan could never be terminated despite language providing otherwise.  Plaintiff's interpretation cannot be correct.  Because the CUNA Plan is silent on the duration of benefits and includes reservation of rights clauses, I conclude that the health care benefits are not vested.

b.  Exclusive benefits clause

Although plaintiffs' interpretation of the exclusive benefits clause is incorrect, the CUNA Plan's exclusive benefit clause does prohibit certain types of amendments, as

19

evidenced by the "no amendment . . . *shall*" language.  This leads to the question: what does the exclusive benefit clause prohibit?   The answer is relevant to determining whether defendants' actions violated the terms of the CUNA Plan.

When there are potentially conflicting clauses in a single contract formed of several documents, the court must "seek an interpretation that reconciles those provisions."  Diehl v. Twin Disc, Inc., 102 F.3d 301, 307 (7th Cir. 1996).  It is not necessary to look outside the plan documents unless a clause is ambiguous.   Kamler v. H/N Telecommunication Services, Inc., 305 F.3d 672, 680 (7th Cir. 2002).  The court should interpret ERISA plan terms "in an ordinary and popular sense."  Id. (internal quotation omitted).

As I explained above, the exclusive benefits clause is in some tension with the reservation of rights clause.  To reach an interpretation that resolves that tension, it is helpful to consider the dual capacities in which employers act under ERISA.   ERISA regulates both the "employer's right to modify or abolish a plan—which it may do without acting as a fiduciary for the worker—and the employer's duty to provide employees the benefits of existing plans."  Heath v. Varity Corp., 71 F.3d 256, 258 (7th Cir. 1995).  The "anti-inurement" rule, 29 U.S.C. § 1103(c)(1), provides further guidance for interpreting the CUNA Plan's exclusive benefits clause.  The rule states that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants."  This rule is not considered a limitation on an employer's ability

20

to modify or administer a plan, only on using a plan's assets for any purpose besides providing currently existing benefits to participants.  Similarly, the CUNA Plan's exclusive benefit clause is read properly as not prohibiting an employer from amending or terminating benefits, but only as limiting the way an employer may use the assets that have become part of a plan.

Plaintiffs contend that the anti-inurement rule is not comparable to the exclusive benefits clause in the CUNA Plan because the rule limits only the use of assets whereas the clause covers the use of "any part of the plan."  Plaintiffs note correctly that the CUNA Plan has no assets, that is, no segregated trust or res from which benefits are paid.  Instead, the plan is unfunded and health insurance premiums are paid out of CUNA Mutual's general assets.  E.g., Shields v. Local 705, International Brotherhood of Teamsters Pension Plan, 188 F.3d 895, 900 n.3 (7th Cir. 1999) ("In the case of an unfunded welfare plan, there is no particular fund which is depleted by paying benefits.").  However, the absence of specific plan assets actually supports treating the rule and the clause as compatible.  Because the CUNA Plan is unfunded and has no plan assets, it would not fall within the scope of the anti-inurement rule.  The exclusive benefits clause fills in for the anti-inurement rule by insuring that assets such as insurance policies, stock, cash, etc., that do become part of the plan are used for the exclusive benefit of plan participants.

This interpretation is further supported by other terms of the plan.  The reservation

21

of rights clause protects CUNA Mutual from having to provide health care benefits to retirees when doing so is no longer financially viable, by granting it the right to terminate the plan.  Interpreting the exclusive benefits clause as prohibiting only amendments that alter the use of things that have already become part of the plan would not lessen the protection afforded by the reservation of rights clause.  Once CUNA Mutual has contributed something to the plan, which would make it a "part of the plan," it would not hurt CUNA Mutual to require it to use that contribution for the exclusive benefit of plan participants.

Finally, the exclusive benefits clause prohibits amendments that cause "any part of the plan" to be *used* or *diverted* for purposes other than the exclusive benefit of retirees.  For something to be used or diverted, that thing must be tangible.  Therefore, I find it proper to limit "any part of the plan" to things akin to assets that the plan takes into possession.  Although to a layperson this interpretation of "any part of the plan" may seem less than intuitive, it resolves the tension in the welfare benefit plan at issue within the framework created by ERISA.  E.g., Diehl, 102 F.3d at 307 (construing terms in welfare benefits plan "may compel a rather forced construction" because "of what it takes to overcome the presumption that welfare benefits do not vest, combined with the court's reluctance to interpret a contract as being at war with itself").

c.  Sick leave accounts

The last dispute about plan terms involves the non-cash sick leave accounts. Resolving this dispute will determine whether defendants' termination of the accounts falls within the scope of ERISA.  Plaintiffs contend that the non-union employee sick leave accounts were either tangible plan assets or part of a payroll practice that falls outside the plan.  They are incorrect on both accounts.  The sick leave accounts were an accounting construct used by the CUNA Plan to help determine how a plan participant's health insurance premiums would be paid.  (The policy creating union retirees' sick leave accounts was different from the policy creating non-union retirees' accounts.  The union retirees could choose a cash payout as opposed to having a non-cash sick leave account to pay insurance premiums.  However, the nature of sick leave accounts for union retirees is irrelevant in this case because the 2008 amendment states that their non-cash sick leave accounts "shall continue to be available for those employees."  Exh. to Cpt., dkt. #2, at PL-COMP 000049. Therefore, their accounts were not terminated and they have no claim regarding defendants' termination of the non-union retirees' accounts.)

CUNA Mutual kept track of employee sick leave accounts with ledger entries reflecting unused sick days.  Although it recognized the liabilities associated with the sick leave accounts on an accrual basis on its balance sheet, the health benefits were funded on a pay-as-you-go basis.  In other words, no money was set aside in a specific fund matching

the cash value of the non-cash sick leave accounts.  Instead, when premiums were to be paid, CUNA Mutual made the payments out of its general assets and decreased the value assigned to sick leave accounts accordingly.  Except for union employees, retirees were never entitled to the option of a cash payout on their sick leave accounts.

Plaintiffs contend that CUNA Mutual's accounting for the sick leave accounts on an accrual basis transformed those accounts into assets of the plan as the retirees performed services to earn sick days.  However, accruing future liabilities does not create plan assets. In accounting for sick leave accounts on an accrual basis, CUNA Mutual was merely following the Financial Accounting Standards Board Statement No. 106, which requires that postretirement benefits be accounted for on an accrual basis according to expected costs.  It is common for employers to account for future non-pension, postretirement benefits without setting aside assets to offset the future liability.  E.g., Charles M. Meyer, Accounting and Finance for Lawyers in a Nutshell 310 (4th ed. 2009) ("[N]onpension benefits are much less likely to be funded by the employer prior to the actual payment of benefits.  Thus, as the expense for the nonpension benefits is recognized, there is likely to be a significant liability reported in the balance sheet since there are no plan assets to offset the liability."). Because, as plaintiffs agree, the CUNA Plan was unfunded, no assets were set aside to counter the future liabilities created by the sick leave accounts.

Further, plan liabilities and plan assets are two separate things.  Cf. Johnson v.

Georgia-Pacific Corp., 19 F.3d 1184, 1189 (7th Cir. 1994) ("Consider what the 'surplus' of a defined-benefit plan is.  It is not a pile of assets stacked in the corner.  It is instead an accounting construct.  The plan determines the value of its assets—stocks, bonds, real property, cash, and so on.  It also estimates the cost of fulfilling all of the promises to pay vested benefits.  The former computation yields the asset side of the balance sheet, the latter the liability side.  The difference between these is the 'surplus' or 'deficit'[.]").  It is true that removing these liabilities from its balance sheet gave CUNA Mutual a $121,823,000 pre-tax increase in income.  However, all this meant was that general assets in CUNA Mutual's corporate treasury that would have gone to pay for those liabilities were now free to be used elsewhere.  To find that the liabilities created by the sick leave accounts were a plan asset would impress a trust on CUNA Mutual's general assets, something ERISA does not permit. E.g., Sutton v. Weirton Steel Division of National Steel Corp., 724 F.2d 406, 412 (4th Cir. 1983) ("In short, ERISA does not impress a trust upon National's corporate treasury for the payment of the contingent benefits.").

Plaintiffs contend that if the non-union sick leave accounts are not plan assets, they must be part of a payroll practice outside the purview of ERISA.  The regulations promulgated by the Secretary of Labor exclude certain "payroll practices" from being considered welfare benefit plans.  29 C.F.R. § 2510.3-1(b).  Plaintiffs contend that CUNA Mutual's sick leave account policy for non-union employees falls under the following payroll

25

practice:

> Payment of an employee's normal compensation, out of the employer's general assets, on account of periods of time during which the employee is physically or mentally unable to perform his or her duties, or is otherwise absent for medical reasons . . . .

29 C.F.R. § 2510.3-1(b)(2).

If the sick leave account policy at issue had provided a payout upon retirement, I might be inclined to agree that it was an exempt payroll practice. Traditional sick leave as well as vacation wages paid out of an employer's general assets are the type of payroll practices excluded from ERISA by the regulations. Shea v. Wells Fargo Armored Service Corp., 810 F.2d 372, 376 (2d Cir. 1987). The fact that the payments are made for accumulated and unused sick or vacation time does not affect the exemption. Massachusetts v. Morash, 490 U.S. 107, 199-120 (1989). However, CUNA Mutual's sick leave account policy was not a traditional sick leave policy. Instead, as previously stated, it was a method for paying health insurance premiums under CUNA Mutual's welfare benefit plan. The non-union plaintiffs were never entitled to a payout of any accumulation of sick hours. Further, use of the sick leave accounts was contingent on the CUNA Plan's remaining in effect, a matter that was out of plaintiffs' control. Cf. Morash, 490 U.S. at 115 ("Because ordinary vacation payments are typically fixed, due at known times, and do not depend on contingencies outside the employee's control, they present none of the risks that ERISA is

26

intended to address."); see also Shea, 810 F.2d at 376 (" The sick leave and vacation wages at issue here fall within the 'payroll practices' provisions because they are payable . . . without additional conditions or contingencies of any kind.").

The sick leave accounts were non-cash accounts that could be used only to pay annual health insurance premiums for non-union retirees participating in the CUNA Plan.  They were not plan assets.  Instead, CUNA Mutual created them as a modification of its payment of health insurance premiums.  Accordingly, the sick leave account policy falls within the scope of ERISA.  Cf. Orth v. Wisconsin State Employees Union Counsel 24, 546 F.3d 868, 870-71 (7th Cir. 2008) (although no issue of payroll practice issue was raised, monetary value of unused sick leave used to pay insurance premiums was considered under ERISA plan).

2.  Plaintiffs' ERISA claims

a.  Fiduciary duty to administer the plan in the interest and for the benefit of plan participants

Plaintiffs contend that defendants violated § 404(a)(1) of ERISA when they amended the CUNA Plan in 2008 to eliminate all employer contributions and subsidies for health insurance premiums.  This is incorrect.  The CUNA Plan is a welfare benefit plan that does not provide for any vested benefits.  For that reason, CUNA Mutual is free under ERISA to

27

amend or terminate the plan "for any reason at any time." Curtiss-Wright Corp., 514 U.S. at 78.  In fact, the Supreme Court has explained that regardless whether the plan is a welfare or pension plan, "[p]lan sponsors who alter the terms of a plan do not fall into the category of fiduciaries. . . .  When employers [adopt, modify or terminate a plan], they do not act as fiduciaries, but are analogous to the settlors of a trust." Lockheed Corp. v. Spink, 517 U.S. 882, 890 (1996).  Simply put, "an employer's decision to amend a [ ] plan concerns the composition or design of the plan itself and does not implicate the employer's fiduciary duties which consist of such actions as the administration of the plan's assets." Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 444 (1999).

The 2008 amendment to the CUNA Plan changed the plan participants entitled to receive certain plan benefits, such as use of non-cash sick leave accounts to pay health insurance premiums, and the amount of benefits that would be received, such as health insurance with or without employer contributions to premiums.  The action does not implicate defendant CUNA Mutual's fiduciary duty under § 404(a). Id.  Defendants were free to alter or amend the health care benefits without considering the plan participants' interests. Young v. Standard Oil (Indiana), 849 F.2d 1039, 1045 (7th Cir. 1988).

Plaintiffs contend that if defendants did not violate their fiduciary duty under ERISA with the 2008 amendment, they violated that duty by misinforming plan participants about the permanency of their benefits.  However, the written information plaintiffs were provided

28

in plan documents was clear.  Defendants told employees that the benefits could be terminated.  Plaintiffs were not misinformed about the permanency of their benefits. Defendants did not breach their fiduciary duty under ERISA.  <u>Vallone</u>, 375 F.3d at 642.

b.  Prohibited transaction

Plaintiffs contend that defendants violated § 406(a)(1)(D) of ERISA, 29 U.S.C. § 1106(a)(1)(D), by terminating their premium subsidies provided for through the non-cash sick leave accounts.  However, defendants could not have violated § 406(a)(1)(D).  Such a violation requires the "transfer to, or use by or for the benefit of a party in interest, of any *assets* of the plan" <u>id.</u> (emphasis added).  As previously explained, the CUNA Plan did not contain any plan assets.  It is an unfunded plan that pays benefits out of CUNA Mutual's general assets.  The accounting for the liabilities created by the sick leave accounts on an accrual basis did not turn those liabilities into plan assets.  To find otherwise would impress a trust on CUNA Mutual's general assets, something that ERISA does not authorize. <u>Sutton</u>, 724 F.2d at 412.

c.  Violation of the CUNA Plan

Plaintiffs contend that the 2008 amendment to the CUNA Plan violated the terms

29

of the plan.  Specifically, plaintiffs contend that ending employer contributions and terminating the non-union non-cash sick leave accounts violated the exclusive benefits clause.  Their contention fails in light of the proper interpretation of the CUNA Plan's reservation of rights clause read in conjunction with the exclusive benefits clause.

The 2008 Amendment terminated two benefits that retirees had been offered under the CUNA Plan:  employer contributions to insurance premiums and the subsidization of non-union retirees' portion of premiums with their non-cash sick leave accounts.  As I have already explained, the CUNA Plan does not provide for any vested benefits.  The unvested nature of the benefits means that they could be terminated at any time for any reason.  The terms of the plan do not state otherwise.

Further, the amendment's termination of benefits did not redirect the use of a part of the plan.  The non-cash sick leave accounts were an accounting construct used in a formula for determining a non-union retiree's premium subsidy.  The accounts were never tied to something tangible, such as assets, but were part of the method defendants used in administering the plan.  The termination of the benefits to which the sick leave accounts were attached, that is, the unvested premium subsidies, removed the need to administer the plan using the sick leave accounts.  Thus, the amendment did not violate the exclusive benefits clause of the CUNA Plan.

30

3.  Summary

It is understandable that plan participants might have been confused about the duration of welfare benefits.  What seemed to them to be lifetime benefits turned out to be something else altogether, because of the reservation of rights clause in the plan.  No doubt plaintiffs feel cheated by the loss of the benefits they anticipated.  However, neither the understandable nor unfortunate nature of the circumstances changes the result of this case.  Under ERISA, "if accurate written information is provided, as it was here, then the plaintiffs are [ ] out of luck."  Id. at 642.

Plaintiffs have failed to state a claim upon which relief can be granted under ERISA.  When the allegations in their complaint are read in conjunction with the documents attached to their complaint it is clear that plaintiffs would not prevail under the most generous reading of their allegations.  Thus, defendants' motion to dismiss the ERISA claims will be granted.


C.  State Law Claim

The non-union plaintiffs Sullivan, Phillips, Specht and Olson also assert four state law claims against defendants: breach of contract; promissory estoppel; breach of unilateral promise; and conversion.  (Plaintiffs have not asserted any state law claim on plaintiff Withee's behalf.)  All four claims arise from the termination of the premium subsidies

31

provided using the non-cash sick leave accounts.  Defendants contend that all of the state

law claim must be dismissed because they are preempted by ERISA.  I agree.

Congress enacted ERISA to provide a uniform regulatory regime over employee

benefit plans.  <u>Aetna Health Inc. v. Davila</u>, 542 U.S. 200, 208 (2004).  To enforce that

purpose, ERISA contains an expansive preemption clause intended "to be so broad as to

entirely replace any state-law claim" to enforce a claim for benefits under an ERISA-governed

employee benefit plan.  <u>Franciscan Skemp Healthcare, Inc. v. Centra States Joint Board</u>

<u>Health and Welfare Trust Fund</u>, 538 F.3d 594, 596 (7th Cir. 2008).  Courts use a two-step

test for determining whether a state law claim is preempted by ERISA: (1) whether the

plaintiff's claims could have been brought under ERISA's civil enforcement provision, §

502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B); and (2) whether the defendant's actions implicate

legal duties independent of ERISA.  <u>Id.</u> at 597 (citing <u>Davila</u>, 542 U.S. at 210).

Under the first step, a claim can brought under § 502(a)(1)(B) of ERISA "to recover

benefits due [ ] under the terms of [the] plan, to enforce [ ] rights under the terms of the

plan, or to clarify [ ] rights to future benefits under the terms of the plan."  29 U.S.C. §

1132(a)(1)(B). All of plaintiffs' state law claims stem from defendants' decision to terminate

the non-cash sick leave accounts.  For each claim, plaintiffs allege that they are entitled to

the use of the sick leave accounts and they seek to continue using their sick leave accounts

to pay health insurance premiums.

32

Plaintiffs' state law claims mirror their ERISA claims.  The state law claims seek to enforce their rights under the terms of the plan by obtaining use of their sick leave accounts to pay health insurance premiums.  The relief sought is premium subsidies, which were benefits under the terms of the plan.  Further, as I explained before, creation of the sick leave accounts was not a payroll practice outside the scope of ERISA.  Instead, they were created as a modification of the CUNA Plan's method of subsidizing retiree health insurance premiums.  Thus, plaintiffs' state law claims could have been brought under ERISA, as in fact they were.

Answering the second question, whether defendants' actions implicated a legal duty independent of ERISA, lends further support to a finding of preemption.  Any right plaintiffs have to use their non-cash sick leave accounts arises solely from the terms of the CUNA Plan.  The 1982 memorandum creating the sick leave accounts was created as a modification of the CUNA Plan.  Therefore, any duty defendants have with respect to the sick leave accounts falls under ERISA.  At the crux of all of plaintiffs' claims, including their state law claims, is their effort to nullify defendants' 2008 amendment to the CUNA Plan.  To allow them to nullify the amendment through state law claims would contradict ERISA's "aggressive form of preemption," which was intended to "'knock out any effort to use state law, including state common law, to obtain benefits under [any employee benefit] plan.'" Sharp Electronics Corp. v. Metropolitan Life Ins. Co., 578 F.3d 505, 514 (7th Cir. 2009)

(quoting <u>Pohl v. National Benefits Consultants, Inc.</u>, 956 F.2d 126, 127 (7th Cir. 1992)).

ERISA's preemptive power is meant to prevent participants in employee benefit plans from engaging in an end run around ERISA's provisions and obtaining relief that is "functionally a benefit to which the written terms of their plan do not entitle them." <u>Pohl</u>, 956 F.2d at 128. As the statute states, "[ERISA] shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). The relationship between plaintiffs' state law claims and CUNA Mutual's employee welfare benefit plan is not the tenuous, remote or peripheral connection that escapes ERISA's broad preemption. <u>Sharp Electronics Corp.</u>, 578 F.3d at 514. Accordingly, plaintiffs' state law claims are preempted by ERISA and must be dismissed for failure to state claims upon which relief may be granted.

ORDER

IT IS ORDERED that

1. The motion to dismiss, dkt. #14, filed by defendants CUNA Mutual Insurance Society and CUNA Mutual Group Medical Care Plan for Retirees is GRANTED;

2. The clerk of court is directed to enter judgment dismissing the complaint filed by plaintiffs John F. Sullivan, William E. Phillips, Karen N. Withee, Paul J. Specht and Thomas

34

O. Olson with prejudice.

Entered this 12th day of February, 2010.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge